UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-190-TBR-LLK

UNITED PROPANE GAS, INC.                                                                 Plaintiff

v.

PINCELLI & ASSOCIATES, INC.                                                              Defendant

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Defendant Pincelli & Associates, Inc.'s ("Pincelli") Motion for Summary Judgment. (Docket No. 33.) Plaintiff United Propane Gas, Inc. ("United Propane") has responded, (Docket No. 37), and Pincelli has replied. (Docket No. 41.) Fully briefed, this matter is ripe for adjudication. For the reasons enumerated below, the Court with DENY Pincelli's Motion.

**Factual Background**

Defendant Pincelli is a broker and/or seller of propane gas. (Docket No. 1-1 at 4.) Plaintiff United Propane supplies propane to residential, commercial, and industrial users. (Docket No. 1-1 at 4.) This dispute arises from negotiations between Pincelli and United Propane for the sale of propane. (Docket No. 33-1 at 1.)

The parties' negotiations began in April 2013, when Kristin Ford the Vice President of Operations for Pincelli contacted Eric Small, President of United Propane about the sale of propane. (Docket Nos. 33-1 at 1; 33-4 at 1; 37 at 5.) On or around April 30, 2013, Ms. Ford met with employees of United Propane at their offices in Paducah, Kentucky. (Docket Nos. 33-4 at 1; 37 at 5.) On May 1, 2013, Ms. Ford sent an e-mail to Mr. Small concerning an agreement for the sale of three million gallons of propane at a flat rate of $1.02 per gallon. (Docket Nos. 33-4 at 1; 37 at 5; 37-3 at 3.) Ms. Ford attached a sample contract to her e-mail to Mr. Small. (Docket Nos.

1

33-4 at 1; 37-3 at 3.) After several e-mails regarding the price and two provisions that United Propane desired to add to the proposed contract, the parties were unable to reach an agreement. (Docket Nos. 33-4 at 1; 37 at 6; 37-3 at 3.)

On June 20, 2013, Ms. Ford once again contacted Mr. Small asking if United Propane was "still interested in the propane supply." (Docket No. 37 at 6; 37-4 at 2.) United Propane alleges that Mr. Small never responded to Ms. Ford's inquiry on June 20, 2013 as she sent him another e-mail on July 1, 2013. (Docket No. 37 at 6.) In Ms. Ford's July 1, 2013 e-mail, she asked Mr. Small if he was "still interested" in the previously discussed one year contract for $1.02 per gallon of propane. (Docket Nos. 33-4 at 1; 37 at 6; 37-5 at 2.) Mr. Small responded that he wanted Pincelli's cheapest price. (Docket Nos. 33-4 at 1; 37 at 6; 37-5 at 2.) The parties once again were unable to reach an agreement during their negotiations via e-mail. (Docket Nos. 33-4 at 1; 37 at 6; 37-5 at 2.)

A month later on August 1, 2013, Ms. Ford sent Mr. Small an e-mail stating that propane prices were rising slightly and asked Mr. Small if he was sure that he was not interested in purchasing propane from Pincelli. (Docket Nos. 33-4 at 1; 37 at 7; 37-6 at 2.) After several e-mails, the parties negotiations stopped, and they did not come to an agreement. (Docket Nos. 33-4 at 1; 37 at 7; 37-6 at 2.)

On August 6, 2013, the e-mail exchange in question took place. The parties sent the following correspondences:

> Mr. Small: WE NEED TO NAIL THIS DOWN!
>
> Ms. Ford: Ok. I'm up in Manchester today. I'll bring your offer to the table. We have 4 parties bidding with 400,000 gallons per month to sell.
>
> Mr. Small: LAST CHANGE 95 fixed . . yes [or] no
>
> Ms. Ford: .97/gallon. That's 1 cent more than MBV mid summer and 3 cents less than we discussed back in May. That is also the best deal/cheapest that we will sell to anyone and in this market now, you can have it in writing. We can do 50,000 gallons per week.

2

> Mr. Small: thank you so much but we don't pay more than competitors usually less
>
> Ms. Ford: You must've misunderstood me. You would be paying less.
>
> Mr. Small: Holston (a competitor) is getting it for less.
>
> Ms. Ford: No they're not. They adjusted their summer volume down because they could only take so much so we moved the price up 3 cents per gallon.
>
> Mr. Small: Ok let's do it thanks.
>
> Ms. Ford: I'll be back in the office about 6 tonight. I'll send you the contract.
>
> Mr. Small: great thanks.
>
> Ms. Ford: Attached is the contract discussed today along with the agreed terms- If we are in agreement I can fill in the appropriate "buyer" information. I will be in the office after 10:30 tomorrow morning, or you can get me on my cell. I would like it if you or Charlie could come out to the plant in Manchester within the month. We will start production in mid-September, but to make sure that we are 100% in production and HD5 quality, I pushed the start date to October 15.

(Docket Nos. 5-2 at 1-2; 33-1 at 2-3; 37 at 7-8; 37-7 at 2-5.) According to United Propane, following this exchange in which it contends the parties formed a contract, the price of propane sharply increased. (Docket No. 37 at 9.) On August 9, 2013, Ms. Ford e-mailed Mr. Small and asked him to please review the contract as soon as possible as propane prices were on the rise. (Docket Nos. 33-1 at 3; 37 at 10; 37-15 at 2.) By August 13, 2013, United Propane returned a signed contract to Ms. Ford. (Docket No. 33-1 at 4; 37 at 10; 37-17 at 3.) Pincelli alleges that United Propane "unilaterally and without notice" altered terms in the signed contract. (Docket No. 33-1 at 4.)

On August 12 or 13, 2013, Pincelli alleges that Ms. Ford informed United Propane's Chief Financial Officer that she could not sign the contract until Pincelli completed due diligence. (Docket No. 33-1 at 4.) An e-mail produced during discovery shows that Ms. Ford was concerned after receiving United Propane's credit score and Duns and Bradstreet Report. (Docket Nos. 37 at

3

11; 37-19 at 2.) Pincelli contends that it requested United Propane provide it with the contact information for the refineries that United Propane had done business with in the past. (Docket No. 41 at 5.) According to Pincelli, United Propane's list of references included smaller companies and not the larger refineries Pincelli requested. (Docket No. 41 at 5.) Pincelli argues that even after receiving references for several refineries on August 16, 2013, none of the contacts provided the needed information. (Docket No. 41 at 5.) United Propane contends that when Pincelli had difficulty obtaining information from United Propane's references, it did not reach out to United Propane for assistance. (Docket No. 37 at 13.) Additionally, Pincelli alleges that the information United Propane provided regarding its bank was insufficient, and Pincelli had to ask United Propane for assistance in acquiring the bank's cooperation. (Docket No. 41 at 5.) Ultimately, Pincelli argues that the bank cooperated further but did not provide it with sufficient information. (Docket No. 41 at 5.) Pincelli concludes that on or around August 21, 2013, it no longer "felt comfortable continuing to negotiate" and performing its due diligence because it did not have sufficient financial information and references. (Docket No. 41 at 5.)

While Pincelli was conducting due diligence, it contends that it simultaneously began having propane production problems. (Docket No. 41 at 5.) On August 22, 2013, Ms. Ford e-mailed Mr. Small informing him of the production problems. (Docket No. 37 at 13; 37-25 at 2; 41 at 6.) In her e-mail, Ms. Ford also stated that she did not think Pincelli would be able to sign the contract because of concerns that there would be a product shortage through the winter. (Docket No. 37 at 13; 37-25 at 2; 41 at 6.) Following this communication, the parties' relationship broke down. Ms. Ford told Mr. Small that she was unable to sign the contract until Pincelli completed due diligence and that "[f]or the contract to be valid, both parties needed to sign it." (Docket No. 37 at 13; 37-27 at 2; 41 at 6.) Mr. Small responded that he believed the parties had "a deal" and that Pincelli wanted to walk away from the agreement due to the rising price of propane. (Docket No. 37 at 13-14; 37-27 at 2.)

**Legal Standard**

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, Pincelli must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of United Propane's claims. Fed. R. Civ. P. 56(c); *see Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming Pincelli satisfies its burden of production, United Propane "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). Keeping this standard in mind, the Court moves on to the merits.

**Discussion**

In support of its Motion for Summary Judgment, Pincelli argues that there was no meeting of the minds and, therefore, a binding contract was not formed. (Docket No. 33-1 at 7.) Specifically, Pincelli states that there can be no contract because A. material terms were left open and B. the formation of a binding contract was contingent on the conclusion of Pincelli's due

5

diligence procedures and a formal execution by both parties of their agreement after the documents were finalized. (Docket No. 33-1 at 7, 12.) Additionally, Pincelli argues that even if the parties formed a contract, it is unenforceable because it violates the statute of frauds.

Under Kentucky law, the threshold question of contract formation is a question of fact. *Concrete Materials Corp. v. C.J. Mahan Const. Co.,* 110 F.3d 63, 1997 WL 151741, at *2 (6th Cir. 1997); *Princesse D'Isenbourg Et Cie Ltd. v. Kinder Caviar, Inc.*, No. CIV.A. 3:09-29-DCR, 2011 WL 720194, at *7 (E.D. Ky. Feb. 22, 2011); *Hickey v. Glass*, 149 S.W.2d 535, 536 (Ky. 1941); *Audiovox Corp. v. Moody*, 737 S.W.2d 468, 471 (Ky. Ct. App. 1987). Alternatively, "the construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Irving Materials, Inc. v. Angelo Iafrate Constr. Co.*, No. 5:15-CV-00009-TBR, 2015 WL 5680488, at *5 (W.D. Ky. Sept. 25, 2015) (citing *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003)). The parties' dispute is governed by Article Two of the Uniform Commercial Code ("UCC") as it involves a contract for the sale of goods, and Kentucky has adopted the UCC. *Princesse D'Isenbourg Et Cie Ltd.*, 2011 WL 720194, at *4 (first citing Ky. Rev. Stat. ("KRS") § 355.2; then citing *A & A Mech. v. Thermal Equip. Sales*, 998 S.W.2d 505, 509 (Ky. Ct. App. 1999)).

### I.  Meeting of the Minds

### A. Absence of Material Terms

In its Motion for Summary Judgment, Pincelli contends that material terms were left out of the parties' e-mail communications on August 6, 2013 and, consequently, the parties did not form a contract. (Docket No 33-1 at 8.) In support of its argument, Pincelli points to the additional terms in the formal agreement that were not contained in the parties' relatively short e-mail correspondence and the absence of a duration term. (Docket No. 33-1 at 9.)

Unlike the common law, the UCC allows for open terms and does not require "complete certainty or definiteness" and "even when certain terms are left open (such as those relating to price, *time*, and delivery), a contract for the sale of goods does not fail for indefiniteness or lack

of mutuality if the parties have intended to make a contract and there is a reasonably certain basis for granting appropriate relief." *A & A Mech.*, 998 S.W.2d at 509 (emphasis added). Notably, under the UCC, contracts must include a quantity term because without a term specifying quantity there is not a basis for granting appropriate relief. *Id.*; *see also* Ky. Rev. Stat. § 355.2-201.

The parties' e-mail exchange on August 6, 2013 recited a price of $0.97 per gallon of propane and a quantity of 50,000 gallons per week. (Docket Nos. 5-2 at 1-2; 33-1 at 2-3; 37 at 7-8; 37-7 at 2-5.) Taken in the light most favorable to United Propane, this Court cannot say that the alleged contract fails simply because the parties omitted the duration of the agreement or included additional language in the formal agreement.

B. Contract Contingent Upon Conclusion of Due Diligence & Formal Execution

Pincelli also contends that it objectively manifested its intent to negotiate with United Propane "toward a binding agreement" as it "clearly relayed" that any entry into a binding contract was conditioned upon its completion of due diligence and a formal execution by both parties of their agreement. (Docket Nos. 33-1 at 10-12; 41 at 9.) According to Pincelli, the exchange between the parties on August 6, 2013 was "no more than an agreement to agree." (Docket No. 41 at 4.)

As the Court has previously noted, the threshold question of contract formation is a question of fact.[1] Here, Pincelli alleges that it "is apparent from the documented exchanges between the parties that [it] required formal execution of an appropriate agreement after the completion of its due diligence review before said agreement would take effect." (Docket No. 33-1 at 3.) Furthermore, Pincelli contends that the parties communicated both telephonically as well

---

[1] Pincelli relies on *First Tech. Capital, Inc. v. JPMorgan Chase Bank, N.A.*, 53 F. Supp. 3d 972 (E.D. Ky. 2014) to support its argument that the parties' e-mail communications on August 6, 2013 were just preliminary negotiations and did not form a binding contract. However, *First Tech Capital* is distinguishable because Chase Bank explicitly conditioned its bid on its completion of due diligence and the formal execution of the parties' agreement. 53 F. Supp. 3d at 978, 984-85. Here, Pincelli has not provided the Court with a similar communication prior to the formation of the alleged contract. Additionally, Article Two of the UCC did not govern the contract dispute in *First Tech. Capital* as it did not involve the sale of goods. Under the UCC, open terms do not cause a contract to fail for indefiniteness. *A & A Mech.*, 998 S.W.2d at 509.

as electronically. (Docket No. 41 at 2.) After reviewing the record, this Court has been unable to identify any evidence that Pincelli communicated its pre-conditions to United Propane prior to August 12 or 13, 2013, several days after the alleged contract came into existence. (Docket Nos. 33-1 at 10; 41 at 4; 41-1 at 1.) Therefore, Pincelli makes unsupported assertions of fact upon which this Court cannot grant summary judgment. Fed. R. Civ. P. 56(c).[2]

## II. Statute of Frauds

Pincelli argues that even if a contract does exist it is unenforceable under the statute of frauds. The UCC's statute of frauds controls in this case. *See Automated Cutting Techs., Inc. v. BJS N. Am. E, Inc.*, No. 5:10-CV-208-REW, 2012 WL 2872823, at *4 (E.D. Ky. July 12, 2012). Under Kentucky's codification of the UCC, "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Ky. Rev. Stat. § 355.2-201. As this Court previously stated:

> Kentucky courts interpret the writing requirement of the statute of frauds loosely and have determined correspondence similar to e-mails as sufficient to deny statute of frauds arguments. See, e.g., *TWB Distribution, LLC v. BBL, Inc.*, 2009 WL 5103604, at *7 (W.D. Ky. Dec. 17, 2009); *Commonwealth Aluminum Corporation v. Stanley Metal Associates*, 186 F.Supp.2d 770, 772–73 (W.D. Ky. 2001). Additionally, the Uniform Electronic Transactions Act (UETA) provides that electronically delivered documents and signatures affixed thereto can satisfy the statute of frauds. KRS 369.102(8) defines an electronic signature as "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." . . . This Court believes that Kentucky courts would find that under the right circumstances—where the intent and signature elements are present— e-mails can satisfy the statute of frauds.

*United Propane Gas Inc. v. Pincelli & Associates Inc.*, No. 5:13-CV-00190-TBR, 2014 WL 496932, at *3 (W.D. Ky. Feb. 6, 2014). Consequently, when viewed in the light most favorable to

---

[2] As the Court finds that United Propane's Breach of Contract claim survives, so to does its Good Faith and Fair Dealing claim. (*See* Docket No. 33-1 at 14.)

8

United Propane, Ms. Ford's name in the signature line of the e-mail satisfies the statute of fraud's signature requirement.

## CONCLUSION AND ORDER

For the reasons enumerated above, Defendant's Motion for Summary Judgment, (Docket No. 33), is DENIED.

cc: counsel of record